UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHAMAR AVERY,

        Petitioner,                      Hon. Richard Alan Enslen

v.                                              Case No. 1:04-CV-289

JOHN PRELESNIK,

        Respondent.
_____/

## REPORT AND RECOMMENDATION

This matter is before the Court on Avery's petition for writ of habeas corpus. In accordance with 28 U.S.C. § 636(b) authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, the undersigned recommends that Avery's petition be **granted**.

## BACKGROUND

On January 15, 2000, between 7:30 and 8:00 p.m., Geoffrey Stanca was robbed and murdered. Petitioner and two others were implicated in this crime. Petitioner was subsequently charged with felony murder and possession of a firearm during the commission of a felony. Following a jury trial, Petitioner was acquitted of first degree murder and possession of a firearm during the commission of a felony, but was convicted of second degree murder. Petitioner was sentenced to serve 20-50 years in prison. Petitioner appealed his conviction to the Michigan Court of Appeals asserting the following claims:

> I. In a trial with two defendants and two juries, Mr. Avery was denied a fair trial and his constitutional right of confrontation when the trial court without a cautionary instruction, admitted an incriminating extrajudicial declaration by the co-defendant which was irrelevant, highly prejudicial, and inadmissible hearsay as to Defendant Avery; trial counsel was constitutionally ineffective for failing to review his objection to the admission of the threat testimony or to request that Defendant's jury be removed while Mr. Budd testified.
>
>> A. The threat testimony was unconnected to Defendant, irrelevant, and unfairly prejudicial.
>>
>> B. The threat testimony was inadmissible hearsay as to Defendant Avery.
>>
>> C. Admission of the hearsay statement denied Mr. Avery his right to confrontation.
>>
>> D. Trial counsel was ineffective for failing to renew his objection to Victor Budd's testimony about Mr. Burns' threat to harm Mr. Stanka, and for failing to ask that Defendant Avery's jury be excused while Mr. Budd testified.
>
> II. The prosecutor committed reversible error and violated Defendant's federal and state constitutional right to a presumption of innocence when he suggested that the Defendant had some obligation to present a defense.

The Michigan Court of Appeals remanded the matter for a *Ginther* hearing on Petitioner's ineffective assistance of counsel claim. *People v. Avery*, No. 229324, Order (Mich. Ct. App., May 30, 2001). The court of appeals retained jurisdiction in the matter, however. *Id.* Following the presentation of evidence, the trial court determined that Petitioner had not been denied the effective assistance of

counsel. (Hearing Transcript, Nov. 2, 2001, 50-63). Petitioner then filed in the Michigan Court of Appeals a supplemental brief in which he asserted the following additional claims:

> I. Defendant was denied effective assistance of counsel and a fair trial by his attorney's failure to present his alibi defense or produce alibi witnesses at trial.
>
> II. Mr. Avery must be resentenced because the wrong sentencing grid was used at sentencing.

The court of appeals affirmed Petitioner's conviction. *People v. Avery*, No. 229324, Opinion (Mich. Ct. App., Oct. 8, 2002). Asserting the same claims, Petitioner moved in the Michigan Supreme Court for leave to appeal. The court denied Petitioner's request for leave to appeal, stating that "we are not persuaded that the questions presented should be reviewed by this Court." *People v. Avery*, No. 122602, Order (Mich., April 29, 2003). On April 26, 2004, Avery submitted the present petition for writ of habeas corpus in which he asserts the following claims:

> I. Petitioner was denied his right to the effective assistance of counsel because of his trial attorney's failure to investigate, contact and interview Petitioner's alibi witnesses, and his failure to produce them at trial.
>
> II. Petitioner was denied his Sixth Amendment right to the effective assistance of counsel when trial counsel failed to object to hearsay testimony before Avery's jury which was only admissible as to Petitioner's co-defendant.

**STANDARD OF REVIEW**

Avery's petition, filed April 26, 2004, is subject to the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254. The AEDPA amended the substantive standards for granting habeas relief under the following provisions:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000); *see also, Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

Prior to *Williams*, the Sixth Circuit interpreted the "unreasonable application" clause of § 2254(d)(1) as precluding habeas relief unless the state court's decision was "so clearly incorrect that it would not be debatable among reasonable jurists." *Gordon v. Kelly*, 2000 WL 145144 at *4 (6th Cir., February 1, 2000); *see also*, *Blanton v. Elo*, 186 F.3d 712, 714-15 (6th Cir. 1999). The *Williams* Court rejected this standard, indicating that it improperly transformed the "unreasonable application"

examination into a subjective inquiry turning on whether "at least one of the Nation's jurists has applied the relevant federal law in the same manner" as did the state court. *Williams*, 529 U.S. at 409.

In articulating the proper standard, the Court held that a writ may not issue simply because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams,* 529 U.S. at 411. Rather, the Court must also find the state court's application thereof to be *objectively* unreasonable. *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12. Accordingly, a state court unreasonably applies clearly established federal law if it "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular. . .case" or "if the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Lancaster*, 324 F.3d at 429 (quoting *Williams*, 529 U.S. at 407).

Furthermore, for a writ to issue, the Court must find a violation of Supreme Court authority. The Court cannot look to lower federal court decisions in determining whether the relevant state court decision was contrary to, or involved an unreasonable application of, clearly established Federal law. *See Harris v. Stovall*, 212 F.3d 940, 943-44 (6th Cir. 2000).

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state court was based on an unreasonable determination of the facts in light of the evidence presented, the factual findings of the state court are presumed to be correct. *See Warren v. Smith*, 161 F.3d 358, 360 (6th Cir. 1998) (citing 28 U.S.C. § 2254(e)(1)). Petitioner can rebut this presumption only by clear and convincing evidence. *Id.*

The deferential standard articulated by the AEDPA, however, does not apply if the state has failed altogether to review a particular claim. As the Sixth Circuit has indicated, where the state court clearly did not address the merits of a claim, "there are simply no results, let alone reasoning, to which [the] court can defer." In such circumstances, the court conducts a *de novo* review. *See McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003); *see also Wiggins v. Smith*, 123 S. Ct. 2527, 2542 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts).

## ANALYSIS

**I.        Failure to Investigate Claim**

Petitioner asserts that his trial attorney did not properly investigate his alibi defense or the witnesses in support thereof. Petitioner asserts that this failure deprived him of his Sixth Amendment right to the effective assistance of counsel. The Michigan Court of Appeals rejected this claim. For the reasons articulated below, the undersigned concludes that this decision represents an unreasonable application of clearly established Supreme Court authority.

As noted above, Geoffrey Stanca was robbed and murdered on January 15, 2000 between 7:30 and 8:00 p.m. (Trial Transcript, June 27, 2000, 35-40, 53-54, 70-78, 111-18, 121-23). Petitioner was charged in connection with this crime and on or about February 11, 2000, David Lankford was appointed to represent him. (Hearing Transcript, Sep. 7, 2001, 21-22). During a subsequent meeting between the two, Petitioner provided counsel with the names of several individuals with whom he claimed to have associated on the date of the subject offense - John Crimes, Sr., and his sons, LaVelle

and Damar. *Id.* at 22-23. Petitioner also provided counsel with the address of Crimes Towing and Auto Service at which these individuals could be contacted. Counsel directed an investigator to attempt to speak with these individuals. *Id.*

According to counsel,[1] the investigator went to Crimes Towing and spoke with LaVelle Crimes on May 23, 2000. *Id.* at 23-27. LaVelle informed the investigator that Petitioner left his vehicle at Crimes Towing on January 14, 2000, for repairs. *Id.* at 24-25. Petitioner returned to Crimes Towing in the "mid afternoon" of the following day and went with Damar (and another individual referred to as Jellyroll) to a local auto parts store. *Id.* at 24-25, 41. After returning from the auto parts store, Petitioner and Damar "went to Damion's house on Ardmore." *Id.* Later that evening, between 9:15 and 9:30 p.m., Petitioner and Damar returned to Crimes Towing, at which point Petitioner paid for the repairs to his car and departed. *Id.* at 24-25. Counsel later obtained a copy of the receipt establishing that Petitioner's car was repaired at Crimes Towing on January 15, 2000. *Id.* at 25-26.

The investigator did not speak to anybody else during this visit. *Id.* at 26-27. Counsel testified that he *believed* that the investigator left his card with somebody at Crimes Towing "with the request that Damar and/or Damion contact us." *Id.* at 26-27. Counsel reported that he instructed the investigator to continue to "attempt to make telephonic contact" with the Crimes. *Id.* at 27-28. Counsel testified that he later "directed" the investigator to "make physical contact one more time" with the individuals identified by Petitioner. *Id.* at 28. Counsel acknowledged, however, that he did not know if the investigator ever complied with his instructions. *Id.*

Counsel reported that the investigator never attempted to contact Damion. *Id.* at 29-32. As for Damar Crimes, the investigator never obtained Damar's home address or phone number and never

---

[1] The investigator did not testify at the *Ginther* hearing.

asked John Crimes, Sr. for assistance contacting Damar. *Id.* at 29-33. Counsel testified that he never personally spoke with LaVelle Crimes, John Crimes, Sr., Damar Crimes, or Damion. *Id.* at 31. Counsel subsequently informed Petitioner that he would not question his alibi witnesses at trial because he was unsure what they "would say or how they would present." *Id.* at 32.

To demonstrate that he was deprived of the right to the effective assistance of counsel, Petitioner must first establish that his attorney's performance was deficient in that it "fell below an objective standard of reasonableness." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (quoting *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984)). Judicial scrutiny of attorney performance, however, is "highly deferential." *Combs v. Coyle*, 205 F.3d 269, 278 (6th Cir. 2000) (citing *Strickland*, 466 U.S. at 689). Thus, the question is whether "in light of all the circumstances viewed at the time of counsel's conduct, counsel's 'acts or omissions were outside the range of professionally competent assistance.'" *Combs*, 205 F.3d at 278 (quoting *Strickland*, 466 U.S. at 689).

Petitioner must further establish that he suffered prejudice resulting from his attorney's deficient performance. *Rompilla v. Beard*, 545 U.S. 374, 380 (2005) (citing *Strickland*, 466 U.S. at 687-88). To establish prejudice, Petitioner must demonstrate that there exists "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Combs*, 205 F.3d at 278 (quoting *Strickland*, 466 U.S. at 694). A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Combs*, 205 F.3d at 278 (quoting *Strickland*, 466 U.S. at 694). An examination of prejudice, however, "must not focus solely on mere outcome determination; attention must be given to 'whether the result of the proceeding was fundamentally unfair or unreliable.'" *Combs*, 205 F.3d at 278 (quoting *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993)).

A.      Deficient Performance

In *Strickland*, the Supreme Court recognized that

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Strickland*, 466 U.S. at 690-91.

Accordingly, the "relevant question is not whether counsel's choices were strategic, but whether they were reasonable." *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000) (citing *Strickland*, 466 U.S. at 688); *see also*, *Clinkscale v. Carter*, 375 F.3d 430, 443 (6th Cir. 2004) (citations omitted). Thus, a purportedly strategic decision cannot be considered reasonable where counsel "has failed to investigate his options and make a reasonable choice between them." *Combs*, 205 F.3d at 288 (quoting *Horton v. Zant*, 941 F.2d 1449, 1462 (11th Cir. 1991)).

With respect to counsel's meager attempts to investigate Petitioner's alibi, the Michigan Court of Appeals concluded that

> While defendant complains that counsel failed to contact Damar Crimes, the investigator did in fact locate and interview another one of the potential witnesses and left his business card with a request that the other potential alibi witnesses contact him. Counsel also had his investigator follow up by telephone and again in person, in an attempt to contact these other witnesses. Given these circumstances, we conclude that counsel adequately investigated. Moreover, counsel made a valid strategic decision not to present such a defense because the information he obtained did not provide defendant with an alibi for the time of the crime.

*People v. Avery*, No. 229324, Opinion at 2 (Mich. Ct. App., Oct. 8, 2002).

This conclusion cannot withstand scrutiny. First, the court of appeals has misconstrued the testimony presented at the *Ginther* hearing. While the court correctly observed that the investigator interviewed LaVelle Crimes, the court inaccurately states as fact that the investigator requested that "the other potential alibi witnesses contact him." As discussed above, there was no evidence presented at the *Ginther* hearing establishing what - if anything - the investigator did to establish contact with "the other potential alibi witnesses." Rather, Petitioner's trial counsel testified that it was his *understanding* that the investigator undertook such action. Unsubstantiated beliefs hardly constitute established facts.

The appellate court also stated that counsel "had his investigator follow up by telephone and again in person, in an attempt to contact these other witnesses." While not inaccurate, this observation is incomplete. Petitioner's counsel testified at the *Ginther* hearing that while he directed the investigator to undertake such follow-up action, he had absolutely no knowledge whether the investigator complied with his instructions. Moreover, counsel testified that he did not, himself, make any attempts to contact any of Petitioner's alibi witnesses.

The conclusion that "counsel adequately investigated" Petitioner's alibi defense is unreasonable by any standard. As noted above, counsel had a duty "to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." This duty to investigate "derives from counsel's basic function which is 'to make the adversarial testing process work in the particular case.'" *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005) (quoting *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986)). Counsel's duty to investigate "includes the obligation to investigate all witnesses who may have information concerning his or her client's guilt or innocence." *Towns*, 395 F.3d at 258 (citations omitted).

The investigator learned from LaVelle Crimes that on the date in question Petitioner had been at Crimes Towing before departing with Damar Crimes in the late afternoon to go to "Damion's house." LaVelle further informed the investigator that Petitioner and Damar returned to Crimes Towing later that evening after the repairs were completed on Petitioner's car. Thus, while LaVelle Crimes was unable to provide Petitioner with an alibi for the time the crime was committed, he identified two individuals who might very well have been able to support an alibi defense. Because Damar and Damion appeared to possess information concerning Petitioner's guilt or innocence, counsel had a professional obligation to investigate the matter. *See Wiggins*, 539 U.S. at 527 ("[i]n assessing the reasonableness of an attorney's investigation, however, a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further").

As discussed above, however, counsel did not himself undertake any efforts to speak with Damar or Damion or determine whether they might be able to provide Petitioner with an alibi. While counsel instructed the investigator to make further attempts to contact potential alibi witnesses, counsel acknowledged that he did not know if the investigator complied with his instructions. While the Court recognizes that attorneys can satisfy their investigatory responsibilities through delegation to others, the attorney nonetheless bears the responsibility for ensuring that his instructions have been followed and that a proper investigation has been conducted. Considering the circumstances in this case, there exists no basis in reason to conclude that counsel conducted (either directly or indirectly) a sufficient investigation into Petitioner's potential alibi defense. The minimal investigation which counsel did conduct identified two individuals who it appeared could provide an alibi for Petitioner during the critical time period. Counsel's efforts to contact these individuals fell well below the range of

professionally competent assistance compelled by the Constitution. The decision by the Michigan Court of Appeals to the contrary is objectively unreasonable in light of the authority discussed herein.

Moreover, the determination by the Michigan Court of Appeals that counsel's decision not to present an alibi defense constituted a "valid strategical decision," is likewise infirm. As previously noted, the question is not whether counsel's decision was strategic, but whether the decision was reasonable. A decision cannot, however, be considered reasonable where the attorney "has failed to investigate his options and make a reasonable choice between them." Counsel failed to sufficiently investigate whether there existed a possible alibi defense in this matter. Accordingly, his decision to not present such a defense was unreasonable. The decision by the Michigan Court of Appeals to the contrary is objectively unreasonable in light of the authority discussed herein.

B.   Prejudice

While Petitioner has established that his trial counsel rendered deficient performance with respect to investigating his alibi defense, Petitioner is entitled to relief only if he can also demonstrate that he suffered prejudice as a result of his attorney's shortcomings. As discussed in the preceding section, the Court was required to evaluate the state court decision regarding the initial prong of the *Strickland* analysis pursuant to the deferential standard articulated in the AEDPA. However, because the state appellate court found counsel's representation adequate it never addressed the question whether Petitioner was prejudiced by counsel's deficient performance. In such a circumstance, the Court is not required to accord deference to the state courts, but instead analyzes the matter *de novo*. *See*, *e.g.*, *Rompilla*, 545 U.S. at 388 ("[b]ecause the state courts found the representation adequate, they never reached the issue of prejudice, and so we examine this element of the *Strickland* claim *de novo*"); *see*

*also*, *Wiggins v. Smith*, 123 S. Ct. 2527, 2542 (2003); *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003); *Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003).

Damar Crimes also testified at the *Ginther* hearing. Damar testified that on January 15, 2000, he arrived at Crimes Towing at "about" 6:00 p.m. (Hearing Transcript, September 28, 2001, 7-8). He and Petitioner departed Crimes Towing at "about" 7:00 p.m. and walked to Darius Boyd's house, which was "2-3" blocks away. *Id.* at 9-11. Darius Boyd was the brother of Damion Boyd. *Id.* at 9. Petitioner and Damar departed Darius' house between 8:00 p.m. and 8:30 p.m. *Id.* at 11. The pair departed after Damar received a telephone call from LaVelle Crimes informing him that the repairs to Petitioner's car were completed. After receiving this telephone call Petitioner and Damar walked back to Crimes Towing, arriving between 8:30 p.m. and 8:45 p.m. *Id.* Damar testified that he had been with Petitioner the entire time since leaving Crimes Towing earlier that day. *Id.* at 11. After arriving back at Crimes Towing, Petitioner paid for the repairs after which he and Damar left (in Petitioner's car) to visit one of Damar's friends. *Id.* at 12. At approximately 9:30 p.m. Petitioner drove Damar back to Darius's house. *Id.* at 12-13. Damar testified that he would have testified at Petitioner's trial if he had been requested to do so. *Id.* at 20. Petitioner also testified at the *Ginther* hearing and provided testimony consistent with that offered by Damar Crimes. (Hearing Transcript, Nov. 2, 2001, 16-31).

As previously stated, to establish that he was prejudiced by his attorney's deficient performance Petitioner must demonstrate that there exists "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." In this context, reasonable probability has been defined as a probability "sufficient to undermine confidence in the outcome." The Court must also consider whether counsel's deficient performance rendered Petitioner's trial "fundamentally unfair or unreliable."

Damar's testimony, if believed, is utterly inconsistent with a finding of guilt and would certainly have resulted in an acquittal. The Court recognizes that there exist grounds on which to challenge the credibility of Damar's testimony, as is the case with practically every witness. Such does not detract from the Court's conclusion, however, because the "actual resolution of the conflicting evidence, *the credibility of witnesses*, and the plausibility of competing explanations is exactly the task to be performed by a rational jury, considering a case presented by competent counsel on both sides." *Ramonez v. Berghuis*, - - - F.3d - - -, 2007 WL 1730096 at *8 (6th Cir., June 18, 2007) (emphasis in original). In other words, it is not for this Court to pass on Damar's credibility. Rather, the Court must determine only whether Damar's testimony - if believed - is sufficient to undermine confidence in the jury verdict. Damar's testimony - if believed - is obviously inconsistent with the jury verdict in this matter as it provides Petitioner with an alibi for the time period in question.

Petitioner's demonstration of prejudice is further supported by the weakness of the State's case. *See Clinkscale*, 375 F.3d at 445 (quoting *Strickland*, 466 U.S. at 696) ("a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support"). The only evidence in this case against Petitioner was the alleged eyewitness testimony of Jacklyn Barker. As courts recognize, there exist "grave reservations concerning the reliability of eyewitness testimony." *Clinkscale*, 375 F.3d at 445. This concern about eyewitness testimony is heightened in this case given Barker's testimony.

Barker testified that on January 15, 2000, between 7:30 p.m. and 8:00 p.m., she witnessed a car park in front of her house. (Trial Transcript, June 27, 2000, 70-71). Barker proceeded to her front door to "look out" because she "figured somebody was coming to [her] house." *Id.* at 71. As Barker was walking to her front door she heard "a pop sound, like an isolated gun shot." *Id.* at 72. Barker

testified that when she arrived at her front door she "didn't look out [the] door because [the] door is all glass." Instead, she "just peeked out." *Id.* Barker testified that it was dark outside and that the nearest street light was "about a house down across the street." *Id.* at 71. Despite these circumstances, Barker testified that she observed three people inside the car. *Id.* at 72. She reported that these three people, one of whom she identified as Petitioner, exited the car and ran away. *Id.* at 72-74, 98-99. Barker identified Petitioner despite acknowledging that she only saw him for "a few movements" and "couldn't see his face." *Id.* at 75-76. After these three individuals ran away, Barker witnessed Geoffrey Stanca "laying on the ground." *Id.* at 77-78.

Barker also testified that she had known Petitioner and his family "since [she] was little." *Id.* at 73. Despite having known Petitioner for many years, when Barker was questioned by the police immediately following the shooting, she reported that she did not recognize any of the individuals involved in the crime. *Id.* at 77, 103-05. On January 19, 2000, four days after the incident, Barker participated in a series of lineups conducted by the police. *Id.* at 106. Petitioner was included in the initial lineup, but Barker did not identify him as one of the three individuals she witnessed on the night of Stanca's murder. *Id.* at 107. While the jury was certainly free to believe Barker's account, her identification of Petitioner is certainly weak in light of two earlier disavowals.

Barker's suspect identification testimony was the only evidence supporting Petitioner's conviction. In such a circumstance, the failure by Petitioner's trial counsel to investigate Petitioner's alibi defense deprived Petitioner of what appears to have been his strongest defense. Counsel's failure can only be characterized as prejudicial to Petitioner's defense. *See Clinkscale*, 375 F.3d at 445. Thus, the Court finds that Petitioner has demonstrated that he suffered prejudice as a result of his trial counsel's deficient performance. Accordingly, Petitioner is entitled to habeas relief.

**II.        Failure to Object Claim**

Petitioner was tried with a co-defendant, Recho Burns, in a joint proceeding with separate juries. Prior to trial, the judge to whom the case was then assigned ruled that certain evidence was admissible only as to co-defendant Burns. (Hearing Transcript, June 8, 2000, 20-58). Specifically, the judge ruled that testimony by Viorel Bud that co-defendant Burns had told him that he was going to kill Geoffrey Stanca was admissible only as to Burns, but not against Petitioner. *Id.* By the time of Petitioner's trial, the case had been reassigned to a different judge. When Bud testified at trial, however, Petitioner's counsel neither requested that Petitioner's jury be excused nor objected to the aforementioned testimony. (Trial Transcript, June 27, 2000, 42-52). Moreover, Petitioner's attorney never requested any type of limiting instruction regarding Bud's testimony. Petitioner asserts that counsel's failure deprived him of his Sixth Amendment right to the effective assistance of counsel.

In rejecting this particular claim, the Michigan Court of Appeals concluded that "[w]hile counsel may have erred, we conclude that defendant has not shown a reasonable probability that, but for counsel's error, the result of the proceedings would have been different." *State v. Avery*, No. 229324, Opinion at 2 (Mich. Ct. App., Oct. 8, 2002). There is no question that counsel's performance in this regard fell well below any objective standard of reasonableness. However, Petitioner cannot establish that the determination by the Michigan Court of Appeals that he suffered no prejudice therefrom is contrary to, or involved an unreasonable application of, clearly established federal law.

Viorel Bud testified to disputes that he witnessed between Geoffrey Stanca and Recho Burns. (Trial Transcript, June 27, 2000, 43-52). Bud testified that during two of these encounters Burns threatened to kill Stanca. Bud made absolutely no mention of Petitioner and was never even asked about Petitioner. *Id.* In short, the evidence in question did not implicate Petitioner in Stanca's murder. At the

conclusion of Petitioner's trial the jury was instructed to "only consider the evidence that has been properly admitted." (Trial Transcript, June 28, 2000, 73).

To conclude that Petitioner's jury was influenced by Bud's testimony would require the Court to assume that the jurors did not follow the instructions given to them by the trial court and that they instead found Petitioner guilty because of a perceived association with his co-defendant. While the jurors may have made such an improper connection, the Court finds that it is much more likely that the jurors convicted Petitioner based solely on the eyewitness testimony of Jacklyn Barker. To conclude otherwise would require the Court to engage in rampant speculation which, in the Court's estimation, is an insufficient basis to grant habeas relief in light of the substantial deference which this Court must accord under the AEDPA to the decision by the Michigan Court of Appeals.

The Michigan Court of Appeals determined that counsel's failure to object to Bud's testimony did not deprive Petitioner of the right to the effective assistance of counsel. While this Court may have reached a different conclusion on the matter, it nonetheless finds that the decision of the Michigan Court of Appeals is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, its decision was not based on an unreasonable determination of the facts in light of the evidence presented. As such, this claim presents no issue on which habeas corpus relief may be granted.

## **CONCLUSION**

For the reasons articulated herein, the undersigned concludes that Petitioner is being confined in violation of the United States Constitution. Accordingly, the undersigned recommends that

Avery's petition for writ of habeas corpus be **granted**.  The undersigned further recommends that the State of Michigan either release Petitioner from custody or afford him a new trial within 120 days.

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of the date of service of this notice.  28 U.S.C. § 636(b)(1)(C).  Failure to file objections within the specified time waives the right to appeal the District Court's order.  *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,


Date:  August 20, 2007                             /s/ Ellen S. Carmody
                                                   ELLEN S. CARMODY
                                                   United States Magistrate Judge