UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

———————————

CHAMAR AVERY,

             Petitioner,

Case No. 1:04-CV-289

v.

Hon. Richard Alan Enslen

JOHN PRELESNIK,

             Respondent.

**<u>OPINION</u>**

_____/

      This matter is before the Court on Respondent John Prelesnik's Objections to United States Magistrate Judge Ellen S. Carmody's Report and Recommendation of August 20, 2007, which recommended granting Petitioner Chamar Avery's habeas petition on one claim. Also before the Court are Petitioner's Objections to the Report, which recommended denying Petitioner's habeas petition on another claim. This Court reviews the Objections, the Report, and pertinent portions of the record *de novo* pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons set forth below and in the Report, the Court finds all Objections to be without merit.

## I. BACKGROUND

      On January 15, 2000, between 7:30 p.m. and 8:00 p.m., Geoffrey Stanka was robbed and killed while attempting to deliver pizza. Petitioner and two other individuals were implicated in this crime, one of whom was tried with Petitioner as a co-defendant, although each had a separate jury. Petitioner was charged with first degree felony murder and possession of a firearm during the commission of a felony. Following a jury trial in 2000, Petitioner was acquitted of those charges but convicted of second degree murder. Petitioner was sentenced to 20 to 50 years in prison.

Petitioner appealed to the Michigan Court of Appeals, who remanded the matter for a *Ginther*[1] hearing on his ineffective assistance of counsel claims.  Upon concluding the *Ginther* hearing, the Michigan trial court denied Petitioner's claims.  Petitioner then filed a supplemental brief in the Michigan Court of Appeals alleging, *inter alia*, that he was denied effective assistance of counsel by his trial attorney's failure to present an alibi defense or produce alibi witnesses at trial. The Michigan Court of Appeals affirmed Petitioner's conviction.  The Michigan Supreme Court thereafter denied Petitioner's motion for leave to appeal.

Petitioner filed the present Petition for Writ of Habeas Corpus on April 26, 2004 on the following claims:

I.  Petitioner was denied his right to the effective assistance of counsel because of his trial attorney's failure to investigate, contact and interview Petitioner's alibi witnesses, and his failure to produce them at trial.

II.  Petitioner was denied his Sixth Amendment right to the effective assistance of counsel when trial counsel failed to object to hearsay testimony before Avery's jury which was only admissible as to Petitioner's co-defendant.

## II.  LEGAL STANDARDS

Habeas relief, since 1996, has been limited by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2241 *et seq.,* which provisions are applicable to this case.

AEDPA provides in pertinent part that:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--

---

[1] *People v. Ginther*, 212 N.W.2d 922 (Mich. 1973).

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

As reflected in the statutory language, there are three avenues for habeas relief: (1) for decisions "contrary" to federal law; (2) for an "unreasonable application" of federal law; and (3) for an "unreasonable determination of the facts." *Id.* Under the caselaw of the United States Supreme Court and the Sixth Circuit Court of Appeals, a state court decision is "contrary to" federal law only when it "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor,* 529 U.S. 362, 412–13 (2000); *see also Biros v. Bagley*, 422 F.3d 379, 386 (6th Cir. 2005) (following *Williams*). A state court decision is an "unreasonable application" of federal law when it "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413.

Factual findings made by the state court, or by state appellate courts based upon the trial record, are presumed to be correct but may be rebutted by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Biros*, 422 F.3d at 386; *Bugh v. Mitchell,* 329 F.3d 496, 500 (6th Cir. 2003). If a state court has failed to review a particular claim, AEDPA's deferential standard does not apply so courts must conduct a *de novo* review. *See McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003).

3

### III.  ANALYSIS

#### A.  Failure to Investigate Claim

The Report concluded that the decision of the Michigan Court of Appeals, denying Petitioner's ineffective assistance of counsel claim based on a failure to investigate, represents an unreasonable application of clearly established Supreme Court authority.  Respondent argues that the Magistrate Judge improperly substituted her judgment for that of the Michigan courts and that Petitioner's trial attorney was justified in not pursuing an alibi defense.  The Court finds Respondent's arguments to be without merit.

The Supreme Court's landmark decision in *Strickland v. Washington*, 466 U.S. 668 (1984), qualifies as "clearly established federal law" under 28 U.S.C. § 2254(d).  *See Williams,* 529 U.S. at 391.  Thus, if Petitioner can show that the Michigan courts adjudicated his failure to investigate claim in a manner contrary to *Strickland*, he is entitled to habeas relief.  To be successful on an ineffective assistance of counsel claim, *Strickland* requires that two elements be proven.  First, a petitioner must demonstrate that his attorney's performance was deficient.  *Strickland*, 466 U.S. at 687; *see also Combs v. Coyle*, 205 F.3d 269, 278 (6th Cir. 2000) (holding that judicial scrutiny of attorney performance must be "highly deferential").  To prove a deficiency, a petitioner must show that his attorney's conduct fell "below an objective standard of reasonableness."  *Strickland*, 466 U.S. at 688.  To satisfy *Strickland's* second element, a petitioner must show prejudice resulting from his attorney's deficient performance, meaning that there exists "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694.  A reasonable probability is "a probability sufficient to undermine confidence in the outcome."  *Id*.

4

1.  Deficient Performance

Regarding the first prong of the *Strickland* Test, an attorney's performance is deemed deficient if the attorney fails to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. *Id.* at 691. "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* Thus, the "relevant question is not whether counsel's choices were strategic, but whether they were reasonable." *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000) (citing *Strickland*, 466 U.S. at 688).

In this case, Petitioner told his trial attorney, David Lankford, that he could not have committed the murder. (Hr. Tr. 27, Nov. 2, 2001.) Petitioner's purported alibi was that he was 30 minutes away from the scene of the murder at the time it occurred waiting on his car to be repaired at Crimes Towing and Auto Shop. (*Id.*) Petitioner provided Lankford with the names of three witnesses who could attest to his whereabouts on January 15: John Crimes Sr., LaVelle Crimes, and Damar Crimes. (Hr. Tr. 22–23, Sept. 7, 2001.) Petitioner also provided the business address of Crimes Towing and told Lankford that he could contact the three individuals there. (*Id.*) Petitioner showed Lankford a receipt from Crimes Towing, dated January 15, further corroborating his story. (*Id.* at 25–26.)

According to Lankford's *Ginther* hearing testimony,[2] he thereafter sent an investigator to Crimes Towing. (*Id.* at 23, 27.) The investigator spoke only with LaVelle Crimes, who stated that Petitioner left Crimes Towing sometime in the "mid-afternoon" of January 15 with LaVelle's

---

[2]Lankford's investigator did not testify at the *Ginther* hearing.

5

brother, Damar Crimes. (*Id.* at 24–27.) LaVelle told the investigator that the pair "went to Damion's house on Ardmore [Street]" and returned to Crimes Towing around 9:15 p.m. or 9:30 p.m. (*Id.* at 24–25.) The investigator did not ask LaVelle, or anyone else for that matter, if he had contact information for Damion or Damar. (*See id.* at 29–33.) Lankford believes that the investigator left his card with someone at Crimes Towing "with the request that Damar and/or Damion contact us," but does not know this for certain. (*Id.* at 26–27, 29.)

As he was preparing Petitioner's case for trial, Lankford came to believe the prosecution had a weak case and that an alibi would bolster Petitioner's chances of acquittal. (*Id.* at 39–40, 43.) Based on this, Lankford instructed his investigator to again attempt to contact the individuals identified by Petitioner as well as visit Crimes Towing one more time. (*Id.* at 26–28.) It is unknown to Lankford whether the investigator complied with this request. (*Id.*) Lankford never contacted any of the individuals on his own or went to Crimes Towing. (*Id.* at 31.)

Damar Crimes' testimony at the *Ginther* hearing revealed that he went to Crimes Towing every day and never received a telephone call or home visit from Lankford or his investigator. (Hr. Tr. 34, Sept. 28, 2001.) Testimony revealed that Damar's father told him that an investigator stopped by Crimes Towing, but Damar never received a business card from the investigator. (*Id.* at 13–14.) Instead, Petitioner's sister gave Damar a hand-written piece of paper with Lankford's number on it. (*Id.* at 14.) Damar tried to call the number; however, he testified that it was a wrong number. (*Id.*) According to Damar, he was never contacted by Lankford or his investigator. (*See id.* at 13–14.) Further, had he been called at trial, he would have provided an alibi for Petitioner during the evening of January 15, including between 7:30 p.m. and 8:00 p.m, in that he was with

Darius Boyd (Damion's Brother) and Petitioner at a location 30 minutes away from the murder scene. (*Id.* 9–11.)

When Darius Boyd[3] testified at the *Ginther* hearing, he corroborated Damar's and Petitioner's account of what took place on January 15, lending further support to Petitioner's alibi defense. (Hr. Tr. 8–9, Nov. 2, 2001.) Darius also indicated that he was never contacted by Lankford or his investigator. (*Id.* at 10; Hr. Tr. 10, Sept. 28, 2001.)

Lankford never indicated to Petitioner that he was having trouble contacting witnesses. (Hr. Tr. 24, Nov. 2, 2001.) Instead, Petitioner testified that Lankford told him that "he didn't think they was [sic] good enough to use and then he said when we got to trial he said he don't [sic] think we need 'em [sic], cause [sic] they didn't have a case against me." (*Id.*) Lankford argues that he made a reasonable strategic decision to not place Damar or Darius on the witness stand because he was unsure what they "would say or how they would present." (Hr. Tr. 32, Sept. 7, 2001.)

"Constitutionally effective counsel must develop trial strategy in the true sense—not what bears a false label of 'strategy'—based on what investigation reveals witnesses will actually testify to, not based on what counsel guesses they might say in the absence of a full investigation." *See Ramonez v. Berghuis*, 490 F.3d 482, 489 (6th Cir. 2007). The Michigan Court of Appeals held that Lankford "made a valid strategical decision not to present such a defense because the information he obtained did not provide defendant with an alibi for the time of the crime." *People v. Avery*, No. 229324, 2002 WL 31264726, at *1 (Mich. Ct. App. Oct. 8, 2002). In so stating, the Michigan Court

---

[3]In retrospect, it appears from the record that Damion was not with Petitioner during the night of January 15, as suggested by LaVelle. (*Id.* at 22.) Instead, Petitioner was with Darius. (*Id.*) Upon speaking to Damion or Damar, however, the investigator would have discovered this. (*See* Hr. Tr. 13, Nov. 2, 2001.)

of Appeals focused on the statements given by LaVelle, which indicated that LaVelle did not have firsthand knowledge of Petitioner's location between the time Petitioner left Crimes Towing in the mid-afternoon and around 9:15 p.m. to 9:30 p.m.   However, the Michigan Court of Appeals' conclusion is unjustified.   Lankford's duty to investigate "includes the obligation to investigate all witnesses who may have information concerning his [] client's guilt or innocence." *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005).   Even though LaVelle was unable to provide the investigator with an alibi for Petitioner at the time the murder was committed, LaVelle identified two other potential alibis—Damar and Damion.   (Hr. Tr. 24–25, Sept. 7, 2001.)   Upon learning this information, Lankford was under a duty to interview these witnesses.[4]

The Michigan Court of Appeals' decision is objectively unreasonable based on the established Supreme Court authority discussed herein.   This Court finds no reasonable decision made by Lankford justifying his failure to contact Damar since he was explicitly mentioned as an alibi witness by Petitioner.   Lankford himself initially recognized that Damar might serve as an important witness.   (Hr. Tr. 14–15, 34, Sept. 28, 2001.)   Further, had Lankford or his investigator spoken with Damar, Damar could have provided information about Darius, another potentially important witness.   (*Id*. At 9–11.)   After his investigator spoke to LaVelle, Lankford's duty to make a reasonable investigation was not complete, it was just beginning.   "Where counsel fails to investigate and interview promising witnesses, and therefore ha[s] no reason to believe they would not be valuable in securing [defendant's] release, counsel's inaction constitutes negligence, not trial strategy."

---

[4]The Court notes that Lankford was under a duty to contact Damar before his investigator spoke to LaVelle because Petitioner identified him as an alibi witness.   LaVelle's statement to Lankford's investigator further magnified the need to speak to Damar.

*Workman v. Tate*, 957 F.2d 1339, 1345 (6th Cir. 1992) (citations omitted); *see also Nealy v. Cabana*, 764 F.2d 1173, 1177 (5th Cir. 1985) (finding that "counsel has the duty to interview potential witnesses and to make an independent investigation of the facts and circumstances of the case").

Just as Lankford's duty to investigate did not end upon his investigator contacting LaVelle, it also did not end when the investigator left his business card at Crimes Towing, although whether this actually occurred is disputed.  The Court cannot find that Lankford exhibited "reasonableness under prevailing professional norms."  *See Strickland*, 466 U.S. at 688.  In so holding, the Court is not holding that Lankford or his investigator actually had to *speak* with Damar.  Damar could have purposely avoided speaking with them and Lankford could have done little about this.  This was not the situation, however, as Damar testified that he would have spoken with them and also testified at Petitioner's trial.  (Hr. Tr. 20, Sept. 28, 2001.)  Lankford was under a duty to reasonably investigate, which entails, at the bare minimum, asking for Damar's phone number or address and reasonably attempting to contact him.  As Petitioner appropriately notes, "[t]his sequence of events shows just how unreasonable it was for a seasoned attorney like Lankford to leave it up to teenagers to get back in touch with him about important alibi evidence in a murder trial."  (Br. Pet. for Writ of Habeas Corpus 20.)

2.  Prejudice

After finding deficient performance on the part of Petitioner's trial counsel, the Court must determine whether prejudice necessarily results therefrom.  Prejudice results if there exists "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *See Strickland*, 466 U.S. at 694.  "A reasonable probability is a

probability sufficient to undermine confidence in the outcome." *Id.* The Michigan Court of Appeals did not reach this question since it concluded that Lankford was not ineffective. *See People v. Avery*, No. 229324, 2002 WL 31264726, at *2 (Mich. Ct. App. Oct. 8, 2002). Thus, the Court analyzes the matter *de novo*. *See Rompilla v. Beard*, 545 U.S. 374, 390 (2005).

Had Lankford interviewed all of Petitioner's potential alibi witnesses and had them testify at trial, this Court cannot say that the result of Petitioner's trial would have been the same. There is a sufficient probability that the verdict would have been different, which undermines this Court's confidence in the verdict. If Damar's testimony was believed by the jury, it would be almost impossible to find Petitioner guilty. "[O]ur Constitution leaves it to the jury, not the judge, to evaluate the credibility of witnesses in deciding a criminal defendant's guilt or innocence." *See Ramonez*, 490 F.3d at 490. "[W]eighing the prosecution's case against the proposed witness testimony is at the heart of the ultimate question of the *Strickland* prejudice prong, and thus it is a mixed question of law and fact not with the Section 2254(e)(1) presumption." *Id.* at 491.

In deciding that Petitioner was prejudiced, the Court places emphasis on the weak evidence resulting in Petitioner's verdict. *See Strickland*, 466 U.S. 696 (concluding that "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support"). The prosecution's case against Petitioner relied heavily on the inconsistent and suspect eyewitness testimony of Jacklyn Barker. Barker testified that between 7:30 p.m. to 8:00 p.m. on January 15, she heard a car pull up in front of her house. (Trial Tr. 70, June 27, 2000.) Upon going to the door to see who was there, she heard a "pop," which she thought was a gunshot. (*Id.* at 71–72.) She then "peeked" through her glass door and saw three men

10

emerge from a car, which was later identified as the victim's car.  (*Id.* at 72–74.)  It was dark outside and part of the car was in a shadow from a streetlight across the road.  (*Id.* at 70–71, 87–88, 95.)

Nevertheless, Barker testified that she saw Petitioner exit the car from the front passenger seat, which was facing away from her house, even though she only saw Petitioner for "a few movements" and "couldn't see his face."  (*Id.* at 74–76.)  Although Barker testified at the preliminary hearing that Petitioner was smiling when he exited the car (Pre. Hr. 12, Feb. 23, 2000), she changed her testimony at trial and admitted that she could not see Petitioner's facial expression.  (Trial Tr. 75–76, June 27, 2000.)  When asked by the prosecutor why her testimony had changed, she denied previously lying and could only respond "I don't know."  (*Id.* at 76.)  The Court can decipher no reason for this inconsistency.

When she was questioned on the night of the murder, Barker told the police that she did not recognize the individuals who exited the car.  (*Id.* at 103–05.)  A day or two later, however, Barker remembered who the men were but did not immediately tell the police because, she suggests, she was afraid.  (*Id.* at 79–80.)  Moreover, Barker later testified that she has known Petitioner, as well as the other two men, from her neighborhood since she was little.  (*Id.* at 73–74.)  These inconsistencies lead the Court to conclude that the prosecution's case against Petitioner was weak and that there is a sufficient probability that an alibi defense would have likely resulted in a different verdict.  On January 19, 2000, Barker failed to pick any of the three men out of a lineup, but did pick another individual out of one of the lineups, although this individual was never charged.  (*Id.* at 106–08.)  Barker failed to provide a sufficient explanation for why she did not pick Petitioner out of the initial lineup, given that she has known him most of her life.

11

Of course, the Court does not intend to assess the credibility of Barker; rather, the Court simply finds that Barker's inconsistent statements, unexplainable actions, and the conditions surrounding her "eyewitness testimony" gave the prosecution a very weak case on which to convict Petitioner. Because of the weakness of the prosecution's case, the Court finds that there is a sufficient probability that, but for Lankford's failure to pursue an alibi defense, the verdict would have been different. It is apparent to the Court that had an alibi witness been produced, the jury could have discredited Barker's testimony and acquitted Petitioner.

### B. Failure to Object Claim

Petitioner argues that his second claim for habeas relief, involving improperly admitted hearsay testimony, was erroneously denied in the Report. At Petitioner's trial, a witness testified to a statement made by Petitioner's co-defendant, Recho Burns, which indicated that Burns threatened to kill the victim. Before trial, the prosecutor moved to admit this testimony but the court denied the motion since the testimony did not relate to Petitioner. At trial, however, the prosecutor admitted this evidence despite the court's earlier ruling. Petitioner's trial counsel failed to ask for the jury to be excused, object, or request any type of limiting instruction.

There is no question that Petitioner's counsel erred; however, the question is whether Petitioner suffered prejudice. The Michigan Court of Appeals and the Magistrate Judge both concluded that Petitioner did not. For the reasons set forth in the Report, the Court finds that Petitioner suffered no prejudice. Specifically, no mention was made of Petitioner in the testimony and Petitioner was in no way implicated. The jury was appropriately instructed to only consider

evidence properly admitted against Petitioner, which would not be this testimony.  Petitioner has not met the demands of 28 U.SC. § 2254(d).

      C.     Certificate of Appealability

Pursuant to 28 U.S.C. § 2253, the Court must also assess whether to grant the issuance of a certificate of appealability to Petitioner on his failure to object claim against his trial attorney.  *See Castro v. United States*, 310 F.3d 900, 903 (6th Cir. 2002) (holding that § 2253 analysis may be done at the time the claim for relief is determined). Under the statute and the United States Supreme Court's determinations in *Slack v. McDaniel,* 529 U.S. 473, 483–84 (2000), and *Barefoot v. Estelle,* 463 U.S. 880, 893 & n.4 (1983), a certificate shall issue if the resolution of the petition is debatable among reasonable jurists or adequate to deserve encouragement for some other reason.  Furthermore, the analysis of the sufficiency of the claims must be individually directed to the substance of the constitutional claims asserted.  *Murphy v. Ohio*, 263 F.3d 466, 466–67 (6th Cir. 2001); *Porterfield v. Bell*, 258 F.3d 484, 486 (6th Cir. 2001).

Upon review, the Court finds that reasonable jurists would not find Petitioner's positions debatable with respect to the substantive grounds for denying relief as to the claim asserted. Accordingly, a certificate of appealability will be denied on Petitioner's failure to object claim.

## IV. CONCLUSION

For the reasons set forth above, a Writ of Habeas Corpus shall enter granting Petitioner Chamar Avery's Petition for Writ of Habeas Corpus, instructing the State of Michigan to either release Petitioner from custody or afford him a new trial within 120 days, adopting the Report and Recommendation, denying Respondent John Prelesnik's Objections to the Report and

Recommendation, denying Petitioner's Objections to the Report and Recommendation, and denying

a certificate of appealability as to Petitioner's failure to object claim.

                                          /s/ Richard Alan Enslen
DATED in Kalamazoo, MI:           RICHARD ALAN ENSLEN
        November 8, 2007          SENIOR UNITED STATES DISTRICT JUDGE